UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MICHELE LAVERNE BROOKS                            :

                                                                  OPINION AND ORDER
                    Plaintiff,                    :               15 Civ. 4707 (GWG)


                         -v.-                     :


COMMISSIONER OF SOCIAL SECURITY,                  :


                    Defendant.                    :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Michele Laverne Brooks brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for Social Security Disability benefits under the Social Security Act.  The

Commissioner has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[1]  For

the reasons stated below, the Commissioner's motion is granted.[2]

I.  BACKGROUND

        A.  Brooks's Claim for Benefits and Procedural History

        Brooks applied for disability benefits on October 17, 2011.  See Administrative Record,

_____

        [1] See Notice of Motion, dated Jan. 6, 2016 (Docket # 21); Memorandum of Law in
Support of the Acting Commissioner's Motion for Judgment on the Pleadings, dated Jan. 6, 2016
(Docket # 22) ("D. Mem."); Notice of Motion, dated Feb. 9, 2016 (Docket #26) ("P. Opp.");
Reply Memorandum of Law in Further Support of the Acting Commissioner's Motion for
Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the
Pleadings, dated Feb. 29, 2016 (Docket # 27).


        [2] Although Brooks has not identified her response as a motion for judgment on the
pleadings, her "failure to do so does not prevent the Court from remanding this matter to the
Commissioner if the record shows that remand is warranted."  Rivera v. Comm'r of Soc. Sec.,
2015 WL 6619367, at *9 (S.D.N.Y. Oct. 30, 2015) (quoting Orr v. Comm'r of Soc. Sec., 2014
WL 4291829, at *4 (S.D.N.Y. Aug. 26, 2014)); accord Carson v. Colvin, 2016 WL 1156746, at
*8 n.6 (S.D.N.Y. Mar. 22, 2016).

filed Jan. 6, 2016 (Docket # 20) ("R."), at 70.  She alleged that her disability began on April 1, 2011.  R. 128.  The Social Security Administration denied her claim on February 7, 2012.  R. 72-74.  Brooks requested a hearing before an Administrative Law Judge ("ALJ"), see R. 78-79, and appeared for a hearing before ALJ Gal Lahat on January 7, 2013, R. 33.  At that time, she was represented by Aaron Vega, an attorney.  Id.  The hearing is described in greater detail below.

The ALJ denied Brooks's claim in a written decision issued on February 22, 2013.  R. 12-27.  The Appeals Council denied review on April 23, 2015.  R. 1-3.  Brooks then filed this action pro se.  See Complaint, dated June 16, 2015 (Docket # 2) ("Complaint").

   B.  The Hearing Before the ALJ

At the hearing, Brooks testified that she lived alone in an apartment in Jamaica, New York.  R. 37.  She finished the eleventh grade.  R. 38.  She completed a "business computer kind of class" in 2007.  Id.  Brooks testified that she was five feet, four inches tall and weighed 150 pounds.  R. 61.

Brooks worked for the New York City School Construction Authority for two years, ending in 2010.  R. 38-39.  This job involved checking the references of contractors who were bidding to work on New York City schools.  R. 39.  This was a temporary job.  Id.  She stopped working there when "the job phased out" because the Authority "had run out of money."  R. 41.  The job involved telephone conversations and filing.  R. 65.

Before working at the New York City School Construction Authority, Brooks had worked for New York Electrical from 1999 until 2007.  R. 39.  She testified that she "started as a temp . . . and worked [her] way up to office manager."  Id.  This job's duties included "data entry," preparing conference rooms for courses offered by her employer, making travel arrangements, and planning events.  R. 39-40.  Brooks estimated that she worked from eight to

2

ten hours a day at this job.  See R. 40.  She testified that "out of the eight hours [she] might have

sat maybe two hours," with the rest of the time standing, id., and that she would occasionally

have to send packages of "[a]pproximately ten pounds," R. 41.

After losing her job at the New York City School Construction Authority, Brooks said

that she did not get a new job "because of [her] age," because she lacked a bachelor's or

associate's degree, and "then [she] became sick."  R. 41-42.

Brooks became aware of her disability when she "went to the dentist to have a tooth

removed, and they put [her] under.  And they had to bring [her] back and send [her] to the

hospital" because of her high blood pressure.  R. 42.  After this incident, she testified that she

went to the doctor and "found out [she] had high blood pressure and then the Hepatitis C and

then a whole bunch of other stuff."  Id.  Brooks testified that she suffers from "osteoarthritis in

[her] right knee," and that "just recently [she] was diagnosed with a pinched nerve in [her]

back."  Id.

Brooks related that her pinched nerve gave her back pain, which affected how long she

was able to sit still.  Id.  She said that she could sit for "[n]o longer than about 10, 15 minutes,

the most."  R. 43.  She also said that she could only stand "[f]or approximately — again,

between 10, 15 minutes, the most."  R. 44.  She described feeling pain down her "whole right

side."  R. 43.  Brooks stated that her right knee "swells every day," but she does not take any

medication for it.  R. 44.

Brooks then testified about her kidney disease.  Id.  She complained that her kidney

disease "keeps me from being alert.  Like the medication that I'm on, it makes me tired."  Id.

She "sleep[s] half the day" and "forget[s] stuff."  Id.

Brooks testified that she spent her days lying down "anywhere from five to six hours."

3

R. 45.  She "[m]ostly sle[pt]" with the television on during this time.  Id.  She has trouble

sleeping at night, either waking up early or during the night because her "back is hurting and

[she has] to take medication so [she] can go back to sleep."  Id.  She took Ambien to help her

sleep.  Id.

Brooks testified that her high blood pressure medicine had adverse side effects, including

"forget[ting] a lot," making her "tired all the time," and making her unable to "concentrate

correctly."  Id.

The ALJ noted that Dr. Jianjun Li,[3] one of Brooks's doctors, indicated that she had

"chronic fatigue."  R. 46.  Brooks explained that this meant that she was "tired all the time."  Id.

As to Dr. Li's notation that Brooks suffered from "body aches," Brooks stated that she suffered

from these body aches "[a]ll day" and that they were "[e]xcruciating."  Id.

Brooks said that she has to "wait for one of my friends to come . . . if I need to go

shopping.  Because I can't really lift and put away my groceries."  Id.  Brooks admitted cooking

once a week to last the whole week.  R. 47.  She testified that a "friend usually comes and does"

house work for her, but she can "do it in spurts" by herself, resting after each task.  Id.  A friend

helped her with laundry.  Id.

Brooks said she was capable of taking public transit, but that she "tr[ies] not to."  See R.

47-48.  She said, "I don't visit anybody.  I don't go anywhere," and "doing the stairs is not good

for me."  R. 48.  She said she only takes public transportation "if I have to go to the doctor or

like I had to come [to the ALJ hearing] today."  R. 48.  She denied doing any social activities,

which she had enjoyed in the past, because she lacked the "energy" and "concentration," saying

---

[3] The transcript refers to this individual as "Dr. Lee."  See, e.g., R. 35, 46.  Other
evidence in the record indicates that the doctor's name is Dr. Jianjun Li.  See R. 218.

that she was "just not interested."  Id.

Brooks testified that she had collected unemployment benefits between July 2010 and April 2012.  R. 49.  She acknowledged that, to collect those benefits, she had "certif[ied] that [she was] ready, able and willing to work."  See id.  She said that her condition "wasn't as bad" while she was collecting unemployment and that she was "trying to still try to find a job" so she could "at least pay [her] bills."  R. 50.  Since that time, her condition "seemed to have gotten worse."  Id.  Brooks told the ALJ that she looked for jobs as an "[o]ffice manager, receptionist, [or in] customer service" while collecting unemployment.  R. 51.  When the ALJ asked if she "believe[d] [she] would have been able to do that work," Brooks responded that she "would have tried."  Id.

Turning to Brooks's medical conditions, Brooks reported that she found out about her high blood pressure in April 2011.  Id.  At around that time, she visited Dr. Kathy Tan and discovered that she had Hepatitis C.  Id.  She did not feel symptoms then, nor did she feel any symptoms of Hepatitis C at the time of the hearing, even though she was "supposed to be on a treatment right now."  Id.  She was "scared to do the treatment," which she had been told to do in March 2012 following a liver biopsy.  R. 52.  Brooks admitted that she was looking for work in March 2012 but that she stopped looking for work in approximately "June of 2012," when "the pain [in her back and leg] became really severe."  See R. 52-53.

Brooks and the ALJ discussed her relationship with three doctors: Dr. Jianjun Li, Dr. Wei Sun, and Dr. Kathy Tan.  Brooks reported visiting Dr. Sun "regular[ly]," R. 53, as well as seeing Dr. Tan "on a regular basis," R. 55; see also R. 42 (Brooks reported visiting Dr. Tan at least once every six months).  Brooks confirmed that she had not "see[n] Dr. L[i] for about six, seven months because [she was] unable to travel" due to her back problems.  See R. 54.  Nonetheless,

she had seen Dr. Tan during that time, whose office was "right around the corner" from Dr. Li's. See R. 54-55.  When the ALJ asked why she visited Dr. Tan, but not Dr. Li, Brooks said, "I really have no answer for that, to be honest with you.  I just haven't gone."  R. 55.

Brooks stated that she began visiting Dr. Sun in "maybe June of 2011," after Dr. Tan referred her to Dr. Sun due to her high blood pressure.  R. 56.  Brooks reported seeing Dr. Sun, "a specialist dealing with the liver and high blood pressure," for a checkup every six months.  Id. He gave her high blood pressure medication, which controls her blood pressure, and told her that she "need[ed] to not be running around . . . to take it easy."  Id.

The ALJ then asked Brooks about her right knee.  Id.  She reported that her knee problems started in "the beginning of 2012."  Id.  Brooks consulted with Dr. Tan about her knee, but Dr. Tan did not refer her to a specialist.  R. 56-57.

Brooks testified that, in November 2012, her back pain became as severe as it was on the date of hearing.  R. 57.  She said that she had not seen a specialist for it, but that Dr. Tan had given her medication for it.  See id.  Brooks's fatigue and body aches began in May or June 2011.  Id.  Brooks went to Dr. Tan about this issue.  R. 58.  Dr. Tan believed Brooks's blood pressure medication caused these problems, and consequently lowered the medication to alleviate the problems, but "[t]he only thing that improved" was that Brooks no longer felt "dizzy, like [she] was going to pass out."  Id.  Dr. Tan had said that her back pain, fatigue, and body aches had been caused by "a pinched nerve in [Brooks's] back."  See R. 58-59.  Dr. Tan gave Brooks "medication to alleviate the pain, and to see if it would go away.  But it's not."  R. 59.

The ALJ then questioned Brooks about her sleeping problems.  R. 59-60.  Brooks claimed these problems started in approximately June 2012.  See R. 60.  She said that she took

6

Ambien to help her sleep, id., but it did not resolve the problem, because she "could take it at 11:00, but by 2:00 [she would be] awake again," R. 59.  Brooks affirmed that she slept "for about six to six and a half hours a night."  R. 60.  She said that she told Dr. Tan that the Ambien was only partially effective, but that Dr. Tan told her that her sleep problems likely resulted from "something on my mind, and I need to stop worrying about whatever it is I'm worrying about."  Id.  Brooks reported taking Gabapentin for her back pain, but she said it did not help her.  See R. 61.

The ALJ then examined Vocational Expert Andrew Vaughn.  R. 62.  Vaughn requested more information regarding the first job Brooks listed as past work – "customer service with an insurance company."  R. 63.  The ALJ examined Brooks, establishing that her duties with that employer originally involved "claims processing" until she was promoted to "senior rep," a job which involved "explain[ing] to [insureds] why [their] claim didn't get paid" over the phone.  R. 64.  In total, she worked for the insurance company for approximately three years.  See id.

Vaughn classified Brooks's past positions.  At New York Electrical, he classified her initial job as "data entry clerk," with a Dictionary of Occupational Titles ("DOT") number of 203-582.054, a sedentary position with "an SVP of 4."  R. 66.[4]  Her next job at New York Electrical was "office manager," DOT number 219-362.014, which the Vocational Expert said is

_____

[4] The DOT has been replaced by an online database called the Occupational Information Network or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm. The O*NET defines Special Vocational Preparation ("SVP") as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help - Specific Vocational Preparation, O*NET Online, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods.  For example, Level 3 is a time period of "[o]ver 1 month up to and including 3 months," while Level 6 is "[o]ver 1 year up to and including 2 years."  Id.

"listed as light, with an SVP of 4." Id. Her first job at the insurance company was as a "claims

clerk" with a "DOT number [of] 241-362.010. It's listed as sedentary, with an SVP of 6. The

second part of the duties would fall under customer service, and that related DOT number is 249-

262.010. That's listed as sedentary, with an SVP of six." Id. Vaughn found that there was no

listing for Brooks's position as a reference reviewer, but he analogized it to "that of a credit

reference reviewer" with a "DOT number [of] 209-362.018. And that's listed as sedentary, with

an SVP of 3." R. 67.

    C. The ALJ's Decision

The ALJ denied Brooks's application for benefits in a written decision issued on

February 22, 2013. R. 15-27. The ALJ found that Brooks met "the insured status requirements

of the Social Security Act through December 31, 2015," that she "ha[d] not engaged in

substantial gainful activity since April 1, 2011, the alleged onset date," and that she "ha[d] the

following severe combination of impairments: hypertension; hepatitis; arthritis; diabetes

mellitus; renal disease; and scoliosis." R. 17. However, the ALJ found that Brooks "does not

have an impairment or combination of impairments that meets or medically equals the severity

of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525 and 404.1526)." Id. The ALJ concluded that Brooks had "the residual

functional capacity to perform . . . the full range of sedentary work."[5] R. 18. The ALJ found

that Brooks could, "[o]n a sustained basis and with normal and customary work breaks,"

_____

[5] The ALJ's opinion states that the ALJ found that Brooks had "the residual functional
capacity to perform less than the full range of sedentary work." R. 18. As the Commissioner
notes, however, D. Mem. at 11 n.2, this is plainly a typographical error given the lengthy
analysis conducted by the ALJ that led to the conclusion that she could perform "a sedentary . . .
range of work." R. 26. We have omitted the error in the quotation above.

8

"lift/carry and push/pull 10 pounds occasionally and less than 10 pounds frequently, stand/walk for 6 hours in an 8 hour workday, and sit for 6 hours in an 8 hour workday."  Id.  The ALJ found that Brooks "can occasionally engage in climbing, kneeling, crouching and crawling."  Id.

The ALJ found that "the claimant's allegations of total disability are not substantiated by the record and are therefore, not wholly credible.  Further, the claimant's longitudinal history, including medical findings, is not consistent with her allegation that she is restricted from all work activity."  R. 23.

The ALJ continued by examining each of Brooks's conditions.  First, the ALJ noted that "the record does not indicate complaints of any symptoms related to [Brooks's] hepatitis diagnosis."  Id.  The ALJ acknowledged that "the record contains some positive findings" as to her other diagnoses of "hypertension, arthritis of the right knee, diabetes mellitus, renal disease, and scoliosis," R. 23, but noted, "tests do not necessarily translate into functional limitations or impairments, which must correlate with clinical findings, considered along with subjective complaints," R. 23-24.

The ALJ noted a July 2012 consultative examination by Dr. John Joseph.  R. 24; see also R. 193-98.  At this consultative examination, Brooks's

> [g]ait, station and stance were normal, and [she] was able to squat fully.  The claimant needed no help getting on or off the examination table . . . .  [Brooks] had full range of motion in all joints, including the right knee, and the rest of the examination was within normal limits with no evidence of any abnormalities.  No end organ damage was noted related to diabetes.

R. 24.  The ALJ also commented that "the record does not indicate any end organ damage related to her diabetes or renal disease."  Id.  The ALJ continued that "the claimant's medical care has been mostly conservative . . . . [I]nvolv[ing] follow up care and monitoring."  Id.  The ALJ also noted that Brooks's "medication is not unusual . . . and appear[s] to have been

effective.  Notably, although the claimant complained of some side effects from medication, the record does not reflect such complaints."  Id.

The ALJ found that statements Brooks made at consultative examinations and other documents in the record showed she had "a greater ability than the claimant testified to at the hearing," indicating "a good range of activities of daily living."  Id.  The ALJ also "note[d] that the claimant received unemployment benefits through April 2012, during which time she looked for work and certified that she was ready, willing and able to work."  Id.  This evidence "constrained" the ALJ "from finding the claimant's allegations and testimony of total disability fully credible in light of the regulatory scheme in place to assess credibility."  Id.

The ALJ accorded "considerable weight" to "the opinion of Dr. John Joseph, the internal medicine consultative examiner."  R. 25.  The ALJ "note[d] that the opinion followed an examination by a duly qualified provider with the opinion, supported by the overall record, which reflects limited findings and medical care."  Id.

The ALJ gave "[s]ome weight" to "the opinion of Dr. [Luis] Zuniga, the DDS medical consultant."  Id.  Dr. Zuniga had opined that Brooks had "a residual functional capacity consistent with no exertional limitations."  R. 21.

The ALJ accorded "[l]imited weight [to] Dr. Sun's assessment," because although Dr. Sun treated Brooks for "urinary frequency," Dr. Sun's assessment did "not provide[] any limitations, noting that the specifics as to any area of functioning are not within [Dr. Sun's] area of specialty."  R. 25; see also R. 240-51.  The ALJ "considered Dr. Sun's assessment that the claimant's symptoms would not likely increase if placed in a competitive work environment." R. 25.  The ALJ "also not[ed] Dr. Sun's opinion that the claimant is unable to engage in full time competitive work on a sustained basis."  Id.  The ALJ decided that Dr. Sun's conclusion "that the

10

claimant is unable to sustain competitive employment is not supported by the underlying records and the course of treatment, with the doctor himself reporting care on an as needed basis." Id. The ALJ concluded that Brooks's "urinary frequency would not result in significant limitations that would preclude sustained work" in a sedentary job. Id. The ALJ also "note[d] that the issue of disability or inability to work is one reserved for the Commissioner." Id.

The ALJ gave "no medical weight" to the opinion of "R. Liranzo, the State agency consultant, who opined that the claimant had no exertional limitations," because Liranzo was "not an acceptable medical source." Id.; see also R. 187-92.

The ALJ "considered but granted limited probative weight to the claimant's testimony" because Brooks's "own statements and the record when considered as a whole do not support the claimant's ultimate allegation of disability." R. 25.

The ALJ recognized that Brooks suffered from "Stage III renal insufficiency which is consistent with moderate symptoms including the above mentioned fatigue." R. 26. The ALJ commented that "[t]his decision in no way detracts from the seriousness of the claimant's renal impairment and recognizes the abnormal findings such as blood work and other laboratory results confirming the chronic nature of the impairment." Id.

Finally, the ALJ compared Brooks's RFC to her "past relevant work as a data entry clerk, claims clerk, customer service representative, and reference receiver/clerk." Id. The ALJ found that Brooks was "able to perform [her past relevant work] as generally performed." Id. The ALJ found that Vocational Expert Vaughn's testimony was "consistent with the information contained in the Dictionary of Occupational Titles." Id.

11

II.  GOVERNING STANDARDS OF LAW

  A.  Scope of Judicial Review Under 42 U.S.C. §§ 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.")

(citation omitted).  The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448 (emphasis in original) (citation and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

      B.  Standard Governing Evaluation of Disability Claims by the Agency

      The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

      To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

13

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

14

C.  The "Treating Physician" Rule

In general, the ALJ must give "more weight to opinions" of a claimant's treating physician when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  Id. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion.  Halloran, 362 F.3d at 32-33 (quoting 20 C.F.R. § 404.1527(c)(2)) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v)

whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R.

§§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-

31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other

evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).  The Second Circuit

has stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and . . . will continue remanding

when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the

weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33.

## III.  DISCUSSION

The papers filed by Brooks state that "it is not feasible to work, I have issues walking as

well as sitting and standing," P. Opp. at *5, and that her "knee [has] complications intense

swelling – medication I take does not allow me to work," Complaint at *1.[6]  The Commissioner

argues that substantial evidence supports the ALJ's decision, including reports from consultative

examiners.  See D. Mem. at 12-13.  Construing Brooks's pro se complaint liberally, Harris v.

Mills, 572 F.3d 66, 72 (2d Cir. 2009), we interpret her filings to argue that the ALJ misapplied

the "treating physician rule" and improperly evaluated her claims of pain and other impairments.

### A.  Treating Physician Rule

On the question of whether the ALJ properly applied the "treating physician" rule, we

note that Dr. Sun was given a questionnaire regarding Brooks's impairments but, with respect to

questions that referred to Brooks's work limitations, stated "N/A" or "not our specialty" in

response to virtually every such question.  R. 241-48.  To the question that asked whether

_____

[6] * ___ refers to pagination assigned by the ECF system.

16

Brooks's symptoms would "likely increase if he/she were placed in a competitive work environment," Dr. Sun answered "no."  R. 245.

In response to a question as to whether Brooks's condition "interfere[s] with the ability to keep the neck in a constant position (e.g. looking at a computer screen, looking down at a desk)," Dr. Sun answered "no."  See R. 246.  Confusingly, Dr. Sun then filled in an answer to the next question even though the next question was to be answered only if Dr. Sun had answered "yes" to the previous question.  See id.  The next question was, "If so, can your patient do a full time competitive job that requires that activity on a sustained basis?"  Id.  Dr. Sun answered "no" to this question.  See id.  Putting aside the fact that there is no medical record from Dr. Sun indicating any diagnosis of a neck impairment, the ALJ was not required to defer to Dr. Sun's response to the latter question because it did not opine on the "nature and severity of [Brooks's] impairment."  20 C.F.R. § 404.1527(c)(2).  Instead, it was more in the nature of a conclusion as to whether Brooks was disabled, an issue that is reserved to the Commissioner.  See 20 C.F.R. § 404.1527(d)(1).

Brooks saw Dr. Jianjun Li to treat her Hepatitis C.  See R. 289-90.  Meiting Liang, a registered physician's assistant who worked for Dr. Li, see R. 217, filled out a questionnaire that noted Brooks's complaints of fatigue and generalized body pain, R. 211-12.  But as was true for Dr. Sun, Liang left blank all questions regarding Brooks's work limitations.  See R. 212-17.  The ALJ reviewed Dr. Li's medical notes at length, R. 19-20, and noted that Brooks had made complaints of "chronic fatigue and generalized body aches," R. 19-20; see also R. 234.  Thus, the ALJ's decision, while making determinations regarding Brooks's ability to work, did not reject an opinion of Dr. Li (or of the physician's assistant who completed the questionnaire). Notably, Brooks testified unequivocally at the hearing that she "really d[id]n't feel any

17

symptoms" of Hepatitis C — either at the initial consultation regarding the disease or afterwards. R. 51.

B. Credibility

The ALJ recognized that Brooks testified during the hearing that she had fatigue, body aches, and back and knee pain that impaired her ability to work. R. 22. Ultimately, the ALJ "considered but granted limited probative weight to the claimant's testimony," because her "own statements and the record when considered as a whole do not support the claimant's ultimate allegation of disability." R. 25. The governing regulations provide that the Social Security Administration "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . . solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 416.929(c)(2). Nonetheless, the regulations also provide that the agency "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Here, the ALJ could properly choose not to credit Brooks's claims regarding her impairments given the other evidence in the record that contradicted them. As the ALJ noted, "the record does not indicate complaints of any symptoms related to [Brooks's] hepatitis diagnosis," and the record was devoid of "evidence that [Brooks's other impairments] result in limitations so severe that the claimant cannot engage in any work activity." R. 23. The ALJ noted that, at the "consultative examination in July 2012," Brooks "was in no acute distress." R. 24. The ALJ discussed specific findings by the consultative examiner, such as Brooks's ability to "squat fully," that her "[g]ait, station and stance were normal," that she had "full range of

18

motion in all joints," and "[n]o end organ damage." Id. The notes from Dr. Joseph's consultative examination confirm these findings. See R. 193-96. For example, although Dr. Joseph noted that Brooks complained of extensive pain, R. 193, a "musculoskeletal" examination showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally" in Brooks's "[c]ervical spine" and "[l]umbar spine," R. 194-95 (capitalization omitted). Dr. Joseph noted that she had "full [range of motion] of hips, knees, and ankles bilaterally," and that there was "crepitation and moderate discomfort" when Brooks flexed her right knee, but that there was "[n]o swelling." R. 195. Dr. Joseph noted that an X-ray of Brooks's spine revealed "scoliosis." Id. Dr. Zuniga, to whose opinion the ALJ accorded "[s]ome weight," R. 25, determined that Brooks's scoliosis was "non-severe," R. 200. Thus, the consulting physicians' findings contradicted Brooks's testimony.

Brooks failed to provide any explanation at all as to why she had not visited Dr. Li to pursue treatment for her Hepatitis C, when she regularly visited Dr. Tan, whose office was "right around the corner" from Dr. Li's. R. 54. She originally ascribed this to her back pain, but when the ALJ pressed her on this inconsistency, she replied that she "really ha[d] no answer for that. I just haven't gone." R. 55. The ALJ could properly take this "inconsistency" regarding the severity of her pain – i.e., that her back hurt too much to visit Dr. Li, but not Dr. Tan – into account. See 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

The ALJ also noted that Brooks's testimony about her daily activities corroborated other record evidence indicating that she "bathes, dresses, cooks, cleans, does laundry and shopping, and uses public transportation independently." R. 24; see also, e.g., R. 145 (indicating no problem with bathing or with personal care in general), 146-47 (cooking, cleaning, laundry, and public transportation), 148 (shopping). These activities are inconsistent with Brooks's testimony

19

that she can only sit or stand for short periods of time.

The ALJ noted that Brooks "received unemployment benefits through April 2012," which impinged her credibility because it meant that Brooks had "certified that she was ready, willing and able to work" after her alleged onset date. R. 24. This was more than a year after her alleged onset date in April 2011. See R. 49-50. Thus, she was certifying that she was able to work a year after her alleged onset date. Brooks's hearing testimony reveals that she collected unemployment benefits as late as June 2012, R. 53, two months after she told the ALJ she had stopped collecting in April 2012, R. 49. The ALJ was entitled to consider this fact in evaluating Brooks's credibility. See, e.g., Nix v. Colvin, 2016 WL 3681463, at *7 (W.D.N.Y. July 6, 2016) ("[C]ourts throughout the United States have held that the issue of a plaintiff claiming to be disabled yet drawing unemployment insurance benefits may be considered in determining a plaintiff's credibility.").

At the hearing, Brooks testified that she suffered from side effects of her blood pressure medication. See R. 45-46. Specifically, she noted that the side effects affected her memory, concentration, and focus. R. 45. She also said, "I'm tired all the time." Id.; see also R. 58 (relating Dr. Tan's belief that Brooks's fatigue is "due to the medication"). She made similar complaints about the medication she took for her kidney disease. R. 44 ("[T]he medication that I'm on, it makes me tired."). The ALJ noted that "the record does not reflect such complaints." R. 24.

The ALJ was correct. These claims conflict with statements Brooks made elsewhere in the record and are unsupported by the record in general. For example, Brooks completed a "Disability Report - Appeal" on March 15, 2012. See R. 167-71 (capitalization omitted). This form specifically asked for a listing of side effects. See R. 169. Brooks did not state any side

20

effects.  See id.  Brooks also completed a "Disability Report - Adult."  See R. 131-38 (capitalization omitted).  She did not list any problems with memory, concentration, or focus on this document in response to a question asking for a "[l]ist [of] all of the physical or mental conditions (including emotional or learning problems) that limit[ed] [her] ability to work."  See R. 132.  In a "Function Report - Adult," dated December 1, 2011, R. 144-55 (capitalization omitted), she noted that she "ha[s] problems paying attention" because her "mind wanders off to other things," but she also noted that she is capable of "finish[ing] what [she] start[s]," R. 151. Moreover, other evidence in the record contradicts Brooks's assertions regarding these side effects.  Dr. Joseph found "[n]o evidence of impaired judgment or significant memory impairment."  R. 195.  As described above, Physician's Assistant Liang did not indicate any exertional limitations imposed by Brooks's complaints of chronic fatigue.  See, e.g., R. 215. Neither did Dr. Sun.  See, e.g., R. 243.

In light of these findings, there was substantial evidence to support the ALJ's determination that Brooks's testimony was not credible and that she could still perform her sedentary past work.[7]

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 21) is granted.  The Clerk is requested to enter judgment and to close this case.

---

[7] Brooks states that she "need[s] to have two surgeries done on both knees which will put [her] out of work."  P. Opp. at *2.  To the extent Brooks's condition has changed since the ALJ's decision, she is free to file a new claim for benefits.

Dated: September 15, 2016
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Michele Brooks
4339 White Plains Rd.
Apt. 5A
Bronx, NY 10466

22